UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | |
|---|---|
| CECILIA R. CARWILE, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. 4:13-cv-00094-TWP-WGH ) |
| CAROLYN W. COLVIN, Acting Commissioner of the Social Security Administration, | ) ) ) ) ) |
| Defendant. | ) |

## ENTRY ON JUDICIAL REVIEW

Plaintiff, Cecilia R. Carwile ("Mrs. Carwile"), requests judicial review of the final decision of the Commissioner of the Social Security Administration ("the Commissioner"), denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. For the following reasons, the Court **AFFIRMS** the Commissioner's decision.

### I. BACKGROUND

**A.  Procedural History**

On September 1, 2009, Mrs. Carwile protectively filed a Title II application for DIB, alleging a disability onset date of May 1, 2009. Her claim was initially denied on March 28, 2010, and again upon reconsideration on May 5, 2010. On June 28, 2010, Mrs. Carwile filed a written request for a hearing, which was subsequently held on November 29, 2011, in Louisville, Kentucky. Mrs. Carwile appeared at the hearing before Administrative Law Judge D. Lyndell Pickett ("the ALJ") without an attorney or other legal representation. The ALJ denied Mrs. Carwile's application on February 16, 2012. The Appeals Council denied review of the ALJ's decision on June 28, 2013. For the purposes of judicial review, the Appeals Council's decision represents the final decision of the Commissioner. 20 C.F.R. § 416.1481. Mrs. Carwile filed this

appeal on July 16, 2013, requesting judicial review of the Commissioner's decision, pursuant to 42 U.S.C. § 405(g) and 1383(c)(3).

**B.     Factual Background**

Mrs. Carwile was forty-four (44) years old at the time of the alleged onset of her disability. She alleges disability due to her morbid obesity, major depressive disorder, and panic disorder; however, she also claims she suffers from bipolar disorder, anxiety, recurring bronchitis, shortness of breath, high blood pressure, acid reflux, sleeping disorder, a torn ligament in the right knee, sciatic pain, left shoulder pain, and diabetes mellitus. She is 5'4" and weighs approximately 332 pounds.

Mrs. Carwile earned a GED, and most recently worked as a certified nursing assistant from 1993 to 2006. She currently lives with her husband who is visually impaired, her adult daughter and the daughter's boyfriend. Mrs. Carwile drives and performs the majority of the household chores, but only does so once a week. She takes care of her personal hygiene independently, and her sister-in-law manages her family's finances. Her testimony at the hearing indicated that she spends most of her time alone in bed, sometimes watching television.

Over approximately the last six years, it has been established through medical evidence that Mrs. Carwile suffers from multiple physical and mental impairments. In May 2008, prior to her alleged date of onset, she underwent surgical arthroscopy of her right knee to repair a posterior horn tear of the medial meniscus. A consultation with Dr. Mehmet S. Akaydin Jr., M.D. ("Dr. Akaydin") in February 2010 revealed that Mrs. Carwile was fully ambulatory and had fully intact lower extremity function bilaterally. She was capable of heel walking, getting on and off the examination table without difficulty, and squatting 1/3 of the way down and back up. While Dr. Akaydin did discover moderate crepitus in Mrs. Carwile's left knee and minimal crepitus in her right knee, he found no "overt joint warmth, edema, erythema or deformity." ([Filing no. 8-2, at

ECF p. 26). Mrs. Carwile continues to receive treatment from her primary care practitioner for generalized joint pain.

Dr. Akaydin evaluated Mrs. Carwile for her claim of sciatic pain and found that she experienced "some diffuse mild to moderate subjective tenderness throughout the left lumbar paraspinal region and around the left SI joint," as well as minimal diminishment of the range of motion in her hips. (Filing No. 8-2, at ECF p. 23). However, Mrs. Carwile demonstrated normal gait, ambulation and muscle strength in her lower extremities.

In May 2009, Mrs. Carwile was diagnosed with pneumonia and chronic bronchitis. Around that time, she began using a bi-level positive airway pressure ("BiPAP") machine and inhalers to help her breathing. An X-ray from June 2009 indicated that her pneumonia had improved with treatment. A pulmonary functioning test in July 2009 returned essentially normal results. In August 2009, Mrs. Carwile was diagnosed with severe obstructive sleep apnea. She continues to use her BiPAP machine and inhalers to control her symptoms.

In October 2009, Mrs. Carwile went to the emergency room with complaints of a cough. She was diagnosed at that time with asthma with cough and early posterior left pneumonia. She was treated with antibiotics. Chest x-rays taken at that time demonstrated low lung volumes without active disease. Mrs. Carwile was treated again for breathing issues in January 2011. Chest x-rays taken at that time "revealed stable hilar and mediastinal structures with no abnormal focal opacities." (Filing No. 8-2, at ECF p. 26). In May 2011, Mrs. Carwile sought treatment from a new pulmonologist and sleep specialist, Dr. Azmi Draw, M.D. ("Dr. Draw"). Dr. Draw altered her BiPAP titration, and she received no further care from him. Mrs. Carwile continues to treat her chronic bronchitis under the supervision of her primary care practitioner.

In August 2009, Mrs. Carwile was hospitalized with complaints of chest pain. The hospital conducted an echocardiogram, which revealed "borderline enlargement of the left ventricle with uniform and probably appropriate contractility with an estimated ejection fraction of fifty percent (50%)." ([Filing No. 8-7, at ECF p. 72](#)). Her blood pressure at that time was elevated at 150/84. However, there was no evidence of myocardial infarction. She was discharged after two days. In September 2009, Mrs. Carwile underwent a cardiac catheterization procedure. Her coronary arteries were found to be unremarkable, and she has not received any treatment from a cardiologist since the procedure.

In January 2011, Mrs. Carwile was treated in the emergency room for a contusion to the left shoulder resulting from a fall. X-rays indicated left AC joint alignment, an intact scapula, and no evidence of acute bony injury or fracture. In February 2011, Mrs. Carwile saw an orthopedic specialist for continued left shoulder pain. Her primary care practitioner treated her for left shoulder pain in both February and September 2011. Despite Mrs. Carwile's complaints of continuous pain, there was no indication of a shoulder abnormality in any physical examination conducted for the purposes of the disability determination.

Mrs. Carwile alleges that she is disabled due to complications with anxiety, major depression, panic disorder and bipolar disorder. Mrs. Carwile was diagnosed with depression and anxiety disorder by her primary care physician Vincent Waldron, M.D. ("Dr. Waldron") who treated her with anti-anxiety medications for the past 10-12 years.

Two state agency psychologists evaluated Mrs. Carwile's mental condition in January 2010, for the purposes of determining her disability status. Kimberly A. Green, Ph.D. ("Dr. Green") diagnosed Mrs. Carwile with Major Depressive Disorder, Chronic and Panic Disorder. Dr. Green assigned Mrs. Carwile a Global Assessment Functioning ("GAF") score of 61,

indicating that Mrs. Carwile had mild difficulties with mood, social, and occupational functioning. Dr. Green noted that Mrs. Carwile's "affect appeared dysphoric and she was tearful during the evaluation." ([Filing No. 8-9, at ECF p. 4](#)). Upon being asked why she had not sought treatment for mental health issues in the past, Mrs. Carwile told Dr. Green "I don't want to talk about things that I've been through," and revealed that she was abused as a child. ([Filing No. 8-9, at ECF p. 3](#)). Mrs. Carwile also informed Dr. Green that she was fired from the job she most recently worked for excessive absences due to illness. ([Filing No. 8-9, at ECF p. 3](#)). Overall, Dr. Green found that Mrs. Carwile had minimal difficulty following directions and comprehending requests. She noted only minimal impairment of memory, concentration and attention.

State agency psychologist F. Kladder, Ph.D. ("Dr. Kladder") conducted a mental residual function capacity ("RFC") assessment and recorded his findings using a Psychiatric Review Technique Form. Dr. Kladder indicated that Mrs. Carwile suffered from Major Depressive Disorder and Anxiety with "recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week." ([Filing No. 8-9, at ECF p. 16](#)). Dr. Kladder also found that Mrs. Carwile had moderate difficulties in maintaining concentration, persistence and pace; maintaining attention and concentration for extended periods; and responding appropriately to changes in the work setting. He opined that Mrs. Carwile was capable of performing simple, repetitive tasks. Dr. Kladder's opinions were subsequently affirmed by Disability Determination Bureau psychologist B. Randal Horton, Psy.D. ("Dr. Horton") in April of 2010.

During the course of treatment, Dr. Waldron referred Mrs. Carwile to the Southern Hills Counseling Center for mental health issues. She began treatment there in March 2011, under the supervision and counsel of Brandy Terrell, L.C.S.W. ("Ms. Terrell"). Between March and

November 2011, Mrs. Carwile met with Ms. Terrell for six different therapy sessions. At each session, Ms. Terrell assigned Mrs. Carwile a GAF score of 46.[1] She diagnosed Mrs. Carwile with Post Traumatic Stress Disorder and Major Depressive Disorder, recurrent, moderate. (Filing No. 8-9, at ECF p. 136). Mrs. Carwile expressed to Ms. Terrell that she wanted "to be able to function daily in a semi-normal way." (Filing No. 8-9, at ECF p. 133). Ms. Terrell noted that Mrs. Carwile had significant issues with immediate memory recall, and that her anxiety had increased to the point of social isolation. (Filing No. 8-9, at ECF p. 136). Ms. Terrell also indicated that, although Mrs. Carwile would have benefitted from increased therapy sessions, her limited insurance and financial resources prevented her from doing so. (Filing No. 8-9, at ECF p. 136).

In December 2011, Elizabeth Grant, MS, MSN, APRN, BC ("Ms. Grant"), a psychiatric nurse practitioner at the Southern Hills Counseling Center, conducted a psychiatric evaluation of Mrs. Carwile. Ms. Grant diagnosed Mrs. Carwile with "Depressive Disorder per HX per statement," and assigned her a GAF score of 55.[2] (Filing No. 8-10, at ECF p. 61). Ms. Grant noted that Mrs. Carwile's speech, judgment and insight were relatively normal. Mrs. Carwile communicated to Ms. Grant her feelings of worthlessness, her patterns of isolation, and her fears of leaving her room. She reported no suicidal ideation, and displayed an affect which was "somewhat" bright according to Ms. Grant. (Filing No. 8-10, at ECF p. 61). Additional facts will be addressed below as necessary.

---

[1] A GAF of 46 indicates "serious symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job)." *http://www.gafscore.com/*, last accessed July 16, 2014.

[2] A GAF of 55 indicates "moderate symptoms (*e.g.*, flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (*e.g.*, few friends, conflicts with peers or co-workers). http://www.gafscore.com/, last accessed July 16, 2014.

## II.     DISABILITY AND STANDARD OF REVIEW

In order to qualify for DIB, a claimant must demonstrate that she has a disability. Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A claimant seeking disability benefits must demonstrate that her limitations prohibit her not only from performing her previous work, but all other kinds of gainful employment that exist in the national economy, considering her age, education and work experience. 42 U.S.C. § 423 (d)(2)(A).

The ALJ uses a five step, sequential analysis to determine whether a claimant qualifies as disabled. If at any step in this analysis it becomes clear that the claimant is not disabled, the analysis will end, and it is not necessary to proceed to the next step. The first step is to determine whether the claimant is engaged in substantial gainful activity. If so, then she does not qualify as disabled, despite any impairment she might have. If she is not engaged in substantial gainful activity, then, at the second step, the ALJ determines whether the impairment from which the claimant suffers is severe, and whether such impairment meets the 12 month duration requirement. 20 C.F.R. § 416.920(a)(4)(ii). Only those impairments that rise to the level of being medically severe qualify as disabilities. Step three requires the ALJ to compare the claimant's severe impairment to the requirements of one in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. The impairment must also meet the minimum 12 month durational requirement. 20 C.F.R. § 416.920(a)(4)(iii). At steps four and five, the ALJ must then determine the claimant's residual functional capacity. A claimant's RFC is the most work she can do considering her all of her impairments. 20 C.F.R. § 404.1545(a)(1); Social Security Ruling ("SSR") 96-8p. At step four, the ALJ must determine, taking all the claimant's impairments together, both severe and non-severe, whether the claimant is capable of performing her past relevant work. 20 C.F.R. §

416.920(a)(4)(iv). If she is capable, she is not disabled. 20 C.F.R. § 416.920(a)(4)(iv). If she is not capable, step five requires a determination of whether the claimant can perform any other work in the relevant economy, considering all of her impairments. 20 C.F.R. § 416.920(a)(4)(v). The burden of proof at the first four steps lies with the claimant. If the claimant provides enough evidence to support her claims, the burden of proof will then shift to the Commissioner to provide evidence at step five. *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992).

The Appeals Council denied review of the ALJ's decision in this case. Therefore, the ALJ's findings became the findings of the Commissioner. *Henderson v. Apfel*, 179 F.3d 507, 512 (7th Cir. 1999). Pursuant to 42 U.S.C. § 405(g), the Court is granted judicial review of the Commissioner's decision. The Court may not reweigh the evidence or substitute its judgment for that of the ALJ. *Harris v. Barnhart*, 219 F.Supp. 2d 996, 972 (E.D. Wis. 2002) (citing *Binion on Behalf of Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997)). However, it is the duty of the Court to review the ALJ's decision to ensure that her findings are supported by substantial evidence and that no error of law occurred. *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

This Court will evaluate whether the ALJ's decision "demonstrate[s] the path of her reasoning," as "the evidence must lead logically to her conclusion." *Rohan v. Chater*, 98 F.3d 966, 971 (7th Cir. 1996) (citing *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (per curiam)) (additional citation omitted). The ALJ "need not evaluate in writing every piece of testimony submitted." *Carlson*, 999 F.2d at 181. However, "the ALJ's decision must be based upon

consideration of all of the relevant evidence." *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). Furthermore, the ALJ's justification of her decision need only be minimal if it is legitimate. *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004). If the Court finds that the ALJ has committed an error of law, "reversal is required, without regard to the volume of evidence in support of the factual findings." *Harris v. Barnhart*, 219 F. Supp. 2d 996, 973 (E.D. Wis. 2002).

## III.  THE ALJ'S DECISION

The ALJ determined as an initial matter that Mrs. Carwile "last met the insured status requirements of the Social Security Act on December 31, 2011." ([Filing No. 8-2, at ECF p. 22](#)). At step one, the ALJ found that Mrs. Carwile did not engage in substantial gainful activity from the date of the alleged onset of her disability through the date she was last insured. At step two, the ALJ found that, through the date she was last insured, Mrs. Carwile suffered from the following severe impairments: morbid obesity, degenerative joint disease of the right knee, status post right knee arthroscopy, chronic bronchitis, sleep apnea, major depressive disorder and panic disorder. At step three, the ALJ found that Mrs. Carwile did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1, through the date she was last insured. The ALJ determined that Mrs. Carwile had the RFC to:

> . . . perform light work as defined in 20 CFR 404.1567(b) except she must be permitted to alternate sitting and standing, meaning standing for at least 30 minutes at a time and sitting for 5 minutes at a time; may only occasionally balance, stoop, kneel, crouch, crawl and climb ramps and stairs; may never climb ladders, ropes or scaffolds; and may only have occasional exposure to extreme heat, wetness, humidity and pulmonary irritants, like fumes, odors, gases, dust and poor ventilation. In addition, the claimant has the mental residual functional capacity to perform only routine repetitive unskilled work with no strict production quotas and only occasional contact with supervisors and coworkers in a task-oriented environment.

9

([Filing No. 8-2, at ECF p. 25](#)). At step four, the ALJ found that Mrs. Carwile was unable to perform any past relevant work through the date she was last insured. At step five, the ALJ decided that, considering Mrs. Carwile's education, age, work experience, and RFC, there were a significant number of jobs that existed in the national economy that she had the capacity to perform. Therefore, according to the ALJ, Mrs. Carwile was not disabled, pursuant to the Social Security Act, from the alleged date of onset through the date he reached his decision.

## IV. DISCUSSION

Mrs. Carwile alleges that the ALJ erred in two aspects of his decision. First, Mrs. Carwile believes that the ALJ erred in failing to consider Dr. Kladder's opinion regarding the severity and frequency of her panic attacks. She argues that all medical opinions in a social security case must be addressed, and that when important or conflicting evidence from the record is ignored, the ALJ has committed error. She also contends that the ALJ erred in failing to articulate his reasoning for failing to address this portion of Dr. Kladder's opinion in his decision, as the ALJ is required to provide the reasoning behind his decisions. Second, Mrs. Carwile alleges that the ALJ's determination of her credibility was patently wrong, due to his improper consideration of her limited amount of therapy sessions since her alleged onset date, the lack of hospitalizations in the record resulting from mental health issues, and inconsistencies in her work history. She requests that the Court reverse the decision of the Commissioner and remand the case for further proceedings.

**A. The ALJ adequately considered Dr. Kladder's opinion regarding Mrs. Carwile's panic attacks.**

This Court acknowledges that an ALJ is required to evaluate all medical opinions in the record. 20 C.F.R. § 404.1527(c); *Haynes v. Barnhart*, 416 F.3d 621, 630 (7th Cir. 2005). And, indeed, the ALJ cites to Dr. Kladder's opinion multiple times in his decision. See [Filing No. 8-2,](#)

10

at ECF p. 24; Filing No. 8-2, at ECF p. 27; Filing No. 8-2, at ECF p. 30. The challenge Mrs. Carwile brings relates to the ALJ's alleged failure to address conflicting evidence in the record, and to logically articulate his reasoning for failing to acknowledge the panic attack portion of Dr. Kladder's opinion. According to the Seventh Circuit, an ALJ is not required to address every piece of evidence in the record, and need only minimally articulate the reasoning for his choices and decisions. *Diaz v. Chater*, 55 F.3d 300, 307-308 (7th Cir. 1995). Additionally, it is not for this Court, but for the ALJ to weigh conflicting evidence in the record, and to decide which opinions merit the most weight. *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir.1985). This Court will therefore not reweigh the evidence in this case, but will enforce the Seventh Circuit's standard of minimal articulation of the ALJ's reasoning and decision to disregard this portion of Dr. Kladder's opinion.

An ALJ faces a difficult task in evaluating the severity of a medical condition which, by nature, is self-reported. In conducting psychological evaluations, Mrs. Carwile's physicians have no choice but to trust her reports of frequent and severe panic attacks, as they are unable to constantly observe her and obtain objective medical evidence to substantiate her claims. As the ALJ is tasked with determining which medical opinions merit the most weight, the ALJ can only look to Mrs. Carwile's credibility to verify her claims regarding the severity of her panic disorder. Furthermore, "it is well settled that an administrative law judge may disregard a medical opinion premised on the claimant's self-reported symptoms if the administrative law judge has reason to doubt the claimant's credibility." *Ziegler v. Astrue*, 576 F. Supp. 2d 982 (W.D. Wis. 2008). Therefore, if Mrs. Carwile is found to be incredible, the ALJ would be within his rights to discount this portion of Dr. Kladder's opinion, as it was premised upon self-reported symptoms. *See Diaz*, 55 F.3d at 307 (an ALJ may choose to discount a portion of a doctor's report when that portion is

11

based upon subjective complaints of the claimant, and the ALJ had found the claimant to be less than fully credible) (additional citations omitted). Additionally, the Court notes that Dr. Kladder's finding was not an independently formed medical opinion. It was a checked box on the Psychiatric Review Technique Form. ([Filing No. 8-9, at ECF p. 16](#)).

The ALJ in this case found that due to the lack of hospitalization in the record resulting from mental health issues, inconsistencies between the RFC assessment provided by Dr. Kladder and Mrs. Carwile's claims of debilitating symptoms, inconsistencies in her work history, and her minimal mental health treatment in the record despite her claims of severe mental impairments, Mrs. Carwile's statements regarding the "intensity, persistence and limiting effects" of her "panic attacks, feelings of worthlessness, social anxiety and isolation" were less than fully credible. [Filing No. 8-2, at ECF p. 26](#), 28. These findings provide more than minimal justification for discounting the panic attack portion of Dr. Kladder's opinion. The ALJ conducted a full and fair credibility assessment, and that portion of Dr. Kladder's opinion was based upon Mrs. Carwile's subjective reporting.[3] Additionally, the Court notes that Dr. Kladder's finding was not an independently formed medical opinion. Dr. Kladder simply indicated this finding by checking a box on the Psychiatric Review Technique Form. ([Filing No. 8-9, at ECF p. 16](#)). For the Court to require more than the minimal justification standard for Dr. Kladder's opinion would be unnecessary.

This Court finds that the ALJ complied with his obligation to address all medical opinions and conflicting evidence contained within them. He was within his right to choose to discount the panic attack notation on the Psychiatric Review Technique Form, and provided adequate reasoning for doing so. The ALJ's conclusion was consistent with the remainder of Dr. Kladder's opinion and the other objective medical records. The ALJ, therefore, did not err in this respect.

**B.      The ALJ's credibility analysis was not patently wrong.**

In order to determine the credibility of a claimant, the ALJ must evaluate a variety of factors, including:

1. the claimant's daily activities;

2. the location, duration, frequency and intensity of the claimant's pain or other symptoms;

3. the factors that precipitate and aggravate the symptoms;

4. the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate pain or other symptoms;

5. treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms;

6. any measures other than treatment the claimant uses or has used to relieve pain or other symptoms;

7. any other factors concerning the claimant's functional limitations and restrictions due to pain or any other symptoms.

SSR 96-7p. The ALJ considered all of the relevant factors above in his credibility assessment analysis, in addition to the objective medical evidence in the record, and Mrs. Carwile's demeanor and persuasiveness at the hearing. ([Filing No. 8-2, at ECF pp. 26-30](#)). The ALJ determined that, overall, Mrs. Carwile's statements regarding the "intensity, persistence and limiting effects" of her symptoms were "not credible to the extent that they [were] inconsistent" with the mental RFC assessments and the record as a whole. ([Filing No. 8-2, at ECF p. 26](#)). The Seventh Circuit has held that the ALJ's credibility determination is entitled to "considerable deference." *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006). This Court will therefore only overturn the ALJ's credibility finding if it is "patently wrong," meaning that it lacks "any explanation or support." *Elder v. Astrue*, 529 F.3d 408, 413-14 (7th Cir. 2008) (citations omitted). Mrs. Carwile argues

that the ALJ committed three errors in his credibility analysis, constituting a patently wrong credibility determination and grounds for reversal.

Mrs. Carwile contends that the ALJ erred in factoring into his credibility analysis her failure to seek more frequent or extensive mental health treatment, without first asking her why she failed to do so. SSR 96-7p provides that an ALJ may consider the frequency of a claimant's treatment when assessing her credibility. SSR 96-7p. However, the ALJ must not make any negative inferences based upon a claimant's lack of treatment without first "considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment." SSR 96-7p. Therefore, consideration of any explanations at all satisfies the requirements of the social security ruling.

Here, the ALJ considered multiple explanations as to why Mrs. Carwile did not seek more treatment before making his credibility finding. At the hearing, the ALJ asked Mrs. Carwile why she began receiving psychological counseling in March 2011, and questioned whether she was getting worse and whether she had insurance to pay for mental health treatment. ([Filing No. 8-2, at ECF p. 52-53](#)). The ALJ offered Mrs. Carwile the opportunity to explain why she did not seek psychological treatment sooner, and whether more treatment would have posed a financial burden to her. In addition, records from Dr. Green indicate that Mrs. Carwile voluntarily chose not to pursue treatment. The Court finds that the ALJ did consider explanations as to why Mrs. Carwile did not seek more frequent or extensive treatment, and therefore did not fail to comply with the SSR guidelines.

Furthermore, the ALJ in this case did not base his credibility finding on Mrs. Carwile's treatment record alone. He found that all of the following elements of the record conflicted with

her statements regarding the severity of her mental symptoms and limitations, including: residual functional capacity assessments, daily activities, lack of hospitalization in the record due to mental health issues, and work history. ([Filing No. 8-2, at ECF p. 28](#)). This Court will consider the other points of the ALJ's credibility assessment with which Mrs. Carwile takes issue in order to determine whether the ALJ supported his determination.

Mrs. Carwile also contends that the ALJ erred in considering as a factor in his credibility analysis that she has not been hospitalized as a result of her mental health issues, as lack of hospitalizations in a claimant's medical records does not logically imply the absence of disability. The Seventh Circuit does not provide much precedent regarding the usage of lack of hospitalization in the record to support a negative credibility finding. However, in the case *Connour v. Barnhart*, the Seventh Circuit affirms using this factor as one of many to support a negative credibility finding. 42 Fed. Appx. 823, 830 (7th Cir. 2002). Here, it is clear that the ALJ considered Mrs. Carwile's lack of hospitalization for mental health issues among a variety of factors. ([Filing No. 8-2, at ECF p. 28](#)). Therefore, the ALJ did not err in this respect. Furthermore, it is clear from his very brief mentioning of this issue that the ALJ did not rely heavily on this factor in making his ultimate credibility determination. ([Filing no. 8-2, at ECF p. 28](#)).

Mrs. Carwile contends that the ALJ erred again by improperly considering her work history in his credibility assessment. ([Filing No. 8-2, at ECF p. 28](#)). The ALJ took issue with the fact that Mrs. Carwile has not had any substantial gainful employment since 2006, which is three years before her alleged onset date. ([Filing No. 8-2, at ECF p. 28](#)). The ALJ also noted Mrs. Carwile's reporting in the medical records that she was retired from employment. ([Filing No. 8-2, at ECF p. 29](#)). Mrs. Carwile does not deny that there are gaps in her work history. However, she objects to the ALJ's failure to consider explanations for the discontinuity in her work history, as well as his

15

categorization of her work history as sporadic. ([Filing No. 8-2, at ECF p. 28](#)). Again, the Court may not reweigh the evidence and determine for itself whether Mrs. Carwile's work history was sporadic. 42 U.S.C.A. §405(g). The Court may only determine whether the ALJ has provided an accurate and logical bridge between the evidence and his conclusion. *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) (citations omitted).

The SSR states that the ALJ should take into account a claimant's prior work history when assessing her credibility. SSR 96-7p. Mrs. Carwile cites no case law or statute in support of her claim that the ALJ should have inquired as to why she failed to maintain substantial gainful employment three years before her onset date. Moreover, the Seventh Circuit has held that a decline in earnings prior to the onset of a claimant's alleged disability, coupled with a claimant's failure to seek treatment at that time, diminishes a claimant's credibility. *Simila v. Astrue*, 573 F.3d 503, 520 (7th Cir. 2009). Mrs. Carwile testified that she stopped working in 2006 due to psychological issues, and she did not seek psychological counseling until March 2011. [Filing No. 8-2, at ECF p. 48](#), 52. In addition, she does not allege a disability onset date prior to 2009. Therefore, as the circumstances of this case are similar to those in *Simila*, the ALJ did not err in factoring Mrs. Carwile's work history against her in his credibility analysis.

In addition to the former factors considered, the ALJ also factored into his credibility assessment Mrs. Carwile's daily activities and his perception that Mrs. Carwile had a "generally unpersuasive appearance and demeanor while testifying at the hearing." ([Filing No. 8-2, at ECF p. 29](#)). The ALJ is "in the best position to determine a witness's truthfulness and forthrightness." *Skarbek v. Barnhart*, 390 F.3d 500, 505 (7th Cir. 2004). Therefore, this Court will not disturb the ALJ's credibility findings. Furthermore, the Court concludes that the ALJ made a credibility

assessment based upon the record as a whole and considered all of the relevant factors. The ALJ did not err in determining Mrs. Carwile's credibility.

## V. CONCLUSION

For the reasons set forth above, the final decision of the Commissioner is **AFFIRMED.**

**SO ORDERED.**

Date: 8/22/2014

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Timothy J. Vrana
timvrana.com

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov